FILED
MAR 2 0 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TINA LAWSON,

Plaintiff,

v.

WALGREEN CO., dba WALGREENS, an Illinois corporation,

Defendant.

CV. 07-1884-AC

OPINION AND ORDER

---

ACOSTA, Magistrate Judge:

Plaintiff Tina Lawson ("Lawson"), filed this action against defendant Walgreen Co., dba Walgreens ("Walgreens"), her prior employer, asserting claims for violation of both the Oregon Family Leave Act (O.R.S. 659A.150 *et seq.*)("OFLA") and the federal Family and Medical Leave Act (29 U.S.C. § 2601 *et seq.*)("FMLA"), as well as a claim for wrongful discharge. Walgreens moves for summary judgment on all three claims. Because Walgreens did not interfere with

Lawson's family leave and because its decision to terminate her employment was not based on her request for medical leave under OFLA and FMLA, Walgreens's motion for summary judgment is granted in its entirety and this case is dismissed with prejudice.[1]

*Background*

Lawson was hired by Walgreens in November 1998 as an Executive Assistant Manager. (Lawson Decl. ¶ 1.) Walgreens promoted Lawson to Store Manager in September 2001 and, in August, 2004, Lawson became the Store Manager of the Walgreens store located at 122nd and Glisan (the "Store") (Lawson Decl. ¶¶ 1-2.) As of August 2006, Lawson was under the supervision of District Manager David Royster ("Royster"). (Royster Decl. ¶ 5-6.)

As Store Manager, Lawson was responsible for the Store's day-to-day operations. (Riewald Decl. Ex. A at 7.) She was expected to comply, and ensure the Store employee's compliance, with Walgreens's policies and procedures. (Royster Decl. ¶ 4; Riewald Decl. Ex. A at 12.) Violation of Walgreens's policies and procedures could result in discipline from a verbal warning up to termination, depending on the circumstances surrounding the violation. (Riewald Decl. Ex. A at 13-14.) Lawson was also responsible for correctly processing the Store's payroll by reviewing computerized Time and Attendance records, which lists the hours worked by each employee, ensuring that the information is correct and forwarding the information to Walgreens's Payroll Department for the processing of direct deposits into employee's bank accounts. (Royster Decl. ¶ 8; Riewald Decl. Ex. A at 7.)

Lawson's initial contacts with Royster were professional and Lawson felt that Royster was

---

[1]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

supportive. (Lawson Decl. ¶ 2.) In late September or early October, 2006, Lawson informed Royster that she was suffering from pain in her left foot, that she had been diagnosed with posterior tibial tendon dysfunction, and that various forms of treatment, including physical therapy, bracing, custom orthoses and surgery, were available. (Riewald Decl. Ex. A at 60, 79.) When alternative treatments did not resolve the problem, Lawson decided to proceed with surgery. (Lawson Decl. ¶¶ 7-8.) In late October, 2006, Lawson contacted Walgreens's human resources department to discuss her medical diagnosis and the amount of disability leave to which she was entitled. (Lawson Decl. ¶ 9.)

On November 1, 2006, Royster visited the Store for a "walk-through," a customary practice in which the District Manager and the Store Manager walk through the aisles of a store while the District Manager informs the Store Manager of problems that need to be corrected. (Lawson Decl. ¶ 15.) During the walk-through, Royster chastised Lawson in a "cross and irritated tone" for not replacing the Halloween stock with Christmas stock on the promo aisle. He told Lawson that she needed to "get this fixed." (Lawson Decl. ¶ 16.) Lawson was confused by Royster's complaint because he had previously told her to leave the Halloween candy on the promo aisle and continue to mark the product down until it was sold out. (Lawson Decl. ¶¶ 13, 14.) She was also surprised that Royster had asked her to personally "put in many hours of physcial labor" replacing the Halloween stock when she was in extreme pain and planning surgery. (Lawson Decl. ¶ 17.) During the rest of the walk-through, Royster moved quickly up and down the aisles despite Lawson's walking cast, often leaving Lawson hurrying to catch up while Royster waited or walking the center aisle trying to locate Royster. (Lawson Decl. ¶ 18.)

Shortly thereafter, Lawson advised Royster of her decision to proceed with the surgery and that she would need to be off work for five and one-half months to recuperate. (Lawson Decl. at ¶¶

 *{SIB}*

9, 11.) Royster informed Lawson that Walgreens did not like Store Managers scheduled out of their Stores between Thanksgiving and Christmas (the "Holiday Season"). He then assured Lawson that if her physician felt that the surgery could not wait until 2007, Walgreens had no choice but to give Lawson the time off during the Holiday Season. (Riewald Decl. Ex. A at 63.) Lawson was aware that Walgreens discouraged employees from scheduling vacation during the Holiday Season, understood the reason why, and felt that it was reasonable. (Riewald Decl. Ex. A at 34, 66.)

Lawson elected, and her physician agreed, to delay the surgery until after the Holiday Season. Lawson did not fill out paperwork to request family leave because she thought it was premature. (Riewald Decl. Ex. A at 65.) She described her conversations with Royster as "discussing options" and represented that she had not made a formal request to Royster for time off. (Riewald Decl. Ex. A at 86.) However, she did think that her discussion with Lawson was adequate notice of her intent to take medical leave. (Lawson Decl. ¶ 21.) Lawson never provided Royster with a start date for her requested leave of absence and Royster never told Lawson that she would not be allowed the take the medical leave whenever her surgery was scheduled. (Royster Dec. ¶ 28; Riewald Decl. Ex. A at 95.)

Also on November 1, 2006, Nick Bromell, an Executive Assistant Manager at the Store ("Bromell"), responded to a query from Royster made the previous month regarding Lawson's support of Bromell. Initially, Bromell had no complaints. Then, it late October, Bromell became concerned about Lawson's lack of presence at the Store and his need to cover for her in her absence on a number of occasions. (Lawson Decl. Ex. S.) On November 5, 2006, Bromell followed up with a listing of the abbreviated hours Lawson worked the previous week. (Lawson Decl. Ex. T.)

Royster returned for a second walk-through with Walgreens's Regional Manager Rob Hasty

("Hasty") on November 9, 2006. (Lawson Decl. ¶ 23; Riewald Decl. Ex. F at 17.) Royster again walked so rapidly that Lawson, who was still in her walking cast, was unable to keep up with him. Lawson gave her note pad to Bromell, who participated in the walk-through while Lawson was left behind. Neither Royster or Hasty informed Lawson of the concerns or comments they discussed with Bromell during the walk-through. (Lawson Decl. ¶ 23.)

On November 10, 2006, Lawson reviewed the Store's Time and Attendance records for the previous pay period. Her review revealed a discrepancy between the hours worked and the hours scheduled. (Lawson Decl. ¶ 39.) She questioned the 9.3 hours worked by Assistant Manager Minh Dang ("Dang") on November 7, 2006, all of which qualified as overtime hours due to the fact that Dang records showed that he worked a total of 52.05 hours during that pay period. (Royster Decl. ¶ 9.) After discussing the issue with Brommel, who could not confirm that Dang worked on November 7, Lawson deleted the 9.3 hours for that day without speaking to Dang. (Royster Decl. ¶ 10; Riewald Decl. Ex. A at 41, 50-51; Lawson Decl. ¶¶ 41-42.)

The next day, Brommel informed Lawson that he thought Dang had, in fact, worked on November 7, 2006. Lawson then reentered Dang's 9.3 hours for that day under Code 37, which was generally used to indicate hours not reported for an employee in a previous pay period, rather than simply reentering the 9.3 hours for November 7, 2006. (Riewald Decl. Ex. A at 48; Lawson Decl. ¶¶42-43.) As a result, Dang was not paid overtime for the 9.3 hours he worked on November 7, 2006. (Royster Decl. ¶ 12.) Additionally, Lawson's actions prevented the 9.3 hours from showing as overtime for the Store on the weekly reports reviewed by Royster, which made the Store appear more profitable to her supervisor, Royster. (Royce Decl. ¶ 16.) Lawson did not discuss or explain her actions at this time with either Dang or Royster even though Walgreens's policy required that

Dang be notified of any changes to his time card. (Royster Decl. ¶ 13; Riewald Decl. Ex. A at 43-44; Def's. Mot. for Summ. J. Ex. H at 1.) Both Dang and Lawson signed Dang's time card with incorrect coding for the 9.3 hours worked by Dang on November 7, 2006. (Lawson Decl. ¶ 47.) Dang relied on Lawson to be accurate and to check with him before making any changes to his time card. (Dang Decl. ¶ 4.)

For various reasons,[2] Royster questioned the total employee work hours reported for the Store during the pay period ending November 10, 2006, and contacted Lawson to discuss his concerns. (Lawson Decl. ¶ 44.) Lawson attempted to explain the discrepancies in the payroll to Royster, who recommended that Lawson submit a "fix-it" ticket transferring responsibility for resolving the discrepancies to the payroll department. The payroll department discovered that one of Lawson's Executive Assistant Managers had improperly coded promotional bonus money as hours worked, corrected the error and, as a result, lowered the number of work hours attributed to the Store during the relevant pay period. However, Royster remained concerned about the small number of overtime hours reported and asked the Loss Prevention Department to review the Store's Time and Attendance reports for the pay period. (Royster Decl. ¶ 17.) Bromell also became concerned about the discrepancies in Dang's payroll for this pay period and made his own complaint to the Loss Prevention Department. (Riewald Decl. Ex. D at 6.)

As part of their investigation of Lawson's payroll discrepancies, Loss Prevention employees Shannon Humphrey ("Humphrey") and Carole Watson-Stover ("Watson-Stover") reviewed the

---

[2]One of the reasons Royster questioned the number of overtime hours reported in this pay period for the Store was because he expected to see a lot of overtime hours worked to help prepare the Store for the walk-through by Hasty. Apparently, Royster did not discuss this issue with Lawson.

Store's Punch Audit Trail and Dang's time card.[3] (Humphrey Decl. ¶ 3; Watson-Stover Decl. ¶ 3.) Humphrey and Watson concluded that Lawson had violated Walgreens's payment procedures in three different instances. First, Lawson improperly manipulated the payroll system when she deleted the 9.3 hours that Dang worked on November 7, 2006, without talking to Dang and then re-entered the time as time worked the previous pay period. Second, Lawson failed to pay Dang the 9.3 hours of overtime he was entitled to. Third, Lawson paid two employees (Dang and Vanessa Frank) for two personal holidays they did not take in December 2005 without prior approval by a company vice-president. (Humphrey Decl. ¶¶ 4-6; Watson-Stover ¶¶ 4-6.)

Humphrey and Watson-Stover met with Lawson on December 4, 2006, to discuss their findings and to allow her to explain her actions. Lawson admitted that she deleted Dang's 9.3 hours, used Code 37 to reenter the time, and never paid Dang his overtime, but she did not explain her conduct to the satisfaction of Humphrey and Watson-Stover. Lawson described her actions as unintentional conduct and a "mistake." (Humphrey Decl. ¶¶ 7-8; Watson-Stover Decl. ¶¶ 7-8.) Humphrey and Watson-Stover exited the meeting to brief Royster on the results of their investigation and Lawson's response to their questions. Watson-Stover and Royster then gave Lawson another chance to explain her actions. At the end of the meeting, Royster suspended Lawson pending his decision on the appropriate discipline. (Watson-Stover Decl. ¶ 9; Royster Decl. ¶ 18.)

---

[3]Dang's time card was apparently provided by Bromell in response to a request from Humphrey. With the time card was an summary from Bromell with his explanation of the discrepancies. (Lawson Decl. Ex. U.) Lawson disputes the accuracy of Bromell's explanation. With the exception of Lawson's payment to Dang for unused personal holidays in December, which Lawson does not dispute, it is evident from the violations listed by Humphrey and Watson-Stover that Bromell's explanation was not relied upon in the investigation. Also, it appears that Bromell's explanation was correct with the only error being his reference to special holidays as vacation days, which he uses interchangeably. (Riewald Decl. Ex. D at 22.) In any event, the court need not further address the explanation, or Lawson's objections thereto, in this Opinion.

On December 7, 2006, Humphrey and Royster met with Lawson and gave her the opportunity to resign or be terminated. Lawson refused to resign and was terminated that same day based on Royster's belief that Lawson had violated Walgreens's payment procedures on three different occasions as described above. (Humphrey ¶ 9: Royster Decl. ¶¶ 19-21, 27.) Royster felt that Lawson's violations warranted termination because it left Walgreens open to legal claims for violation of wage laws for unpaid overtime wages, penalties, attorney fees and costs. He was also concerned that Lawson's actions could damage workplace morale and irreparably harm the trust relationship between Walgreen and its employees. (Royster Decl. ¶¶ 23-24.) Royster had discussed his decision with Humphrey and Watson-Stover who confirmed that other Walgreens's managers had been terminated for similar instances of manipulating payroll records, and without verbal, written, or final warnings. (Riewald Sur-Response Decl. Ex. 2 at 3-4.) At the meeting, Lawson mentioned to Royster her pending request for medical leave. She also asked for the documentation on which her termination was based. Royster did not respond to either comment. (Lawson Decl. ¶¶ 52, 59.)

Lawson admitted that her actions could look suspicious to Walgreens and that if she had engaged in them willfully, her termination would be justified. (Riewald Decl. Ex. A at 56-58.) However, under the circumstances, Lawson thought that written documentation of her actions was the appropriate form of discipline. (Marshall Decl. Ex. DD at 5.)

After her termination, Lawson contacted her physician to schedule a date for her surgery. By letter dated February 13, 2007, Plaintiff was informed that her surgery was scheduled on March 7, 2007. (Riewald Decl. Ex. A at 87.)

*Legal Standard*

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). The requirement is that there be "no genuine issue of material fact." *Pocatello Educ. Ass'n. v. Heideman*, 504 F.3d 1053 (9th Cir. 2007).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324. In order to meet this burden, the nonmovant "may not rely merely on allegations or denials in its own pleading," but must instead "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements.").

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

*Discussion*

A. Interference with Family Leave

Lawson alleges in her First Claim for Relief that Walgreens interfered with her right to take medical leave under OFLA. Her Second Claim for Relief asserts the same claim under FMLA. FMLA and OFLA allow eligible employees to take twelve workweeks of leave per year to care for their own or a family member's serious health condition. 29 U.S.C. § 2612(a)(1)(D) (2007); O.R.S. 659A.162(1) (2007). Employers are not allowed to deny or in any way interfere with an employee's right to take leave under either FMLA or OFLA. 29 U.S.C. §2615(a) (2007); O.R.S. 659A.183(1) (2007). The Oregon legislature specifically directed that OFLA "shall be construed to the extent possible in a manner that is consistent with any similar provisions of [FMLA.]" O.R.S. 659A.186(2) (2007). Accordingly, the court will address Lawson's First and Second Claims for Relief together.

To prove a claim for interference with a statutory right to medical leave, an employee must establish that: 1) they are an eligible employee; 2) their employer is an eligible employer; 3) the employee was entitled to take medical leave; 4) the employee gave proper notice of his intent to take medical leave; and 5) the employer took actions which denied the employee the right to take the medical leave. *Price v. Multnomah County*, 132 F. Supp. 2d 1290, 1297 (D. Or. 2001). Depriving an employee of the ability to take medical leave is considered retaliation under FMLA. The employers' intent is not relevant – the only question is whether the employee was denied rights to which they were entitled. *Id.* However, employees who avail themselves of their rights under FMLA are not entitled to greater rights to benefits or conditions of employment than other employees. 19 U.S.C. § 2614(a)(3)(B) (2007); 29 C.F.R. §825.216 (2008). Where an employer can establish that they would have taken the same action even if the employee had not asserted their

rights under FMLA, a claim for interference will not stand. Therefore, an employee must establish, by a preponderance of the evidence, that their claim for benefits under FMLA was a negative factor in their employer's decision to terminate them. *Peterson v. Tri-County Metro. Transp. Dist. of Oregon*, CV No. 06-1828-ST, 2008 WL 723521 at *9 (D. Or. March 14, 2008)(citing *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). This may be accomplished with the use of either direct or circumstantial evidence. *Bachelder*, 259 Or. at 1125.

Here, Lawson claims that Walgreens interfered with her right to take leave under FMLA and OFLA by terminating her before she could schedule and take leave related to her knee surgery. Walgreens argues that it was justified in terminating Lawson based on her violations of Walgreens's payroll practices on more than one occasion.

An employee is entitled to medical leave under both FMLA and OFLA only while they are in the employ of a qualified employer. During the time Lawson was employed by Walgreens, she had Royster's approval to schedule her surgery anytime her physician felt it was necessary. Lawson was the one who decided to postpone her surgery until after the Holiday Season and, in fact, did not contact her physician to schedule the surgery until after she was terminated. Accordingly, at the time she was terminated, Lawson had Walgreen's consent to take medical leave under FMLA for her knee surgery.

Lawson, however, argues that Walgreens interfered with her right to take medical leave when it terminated her. Lawson's argument seems premised on the notion that once an employee has expressed an intent to take medical leave under FMLA and OFLA, the employer is obligated to maintain their employment until after the medical leave has been taken regardless of when that leave is scheduled, whether or not the employee is satisfactorily performing their job duties, or whether

or not that employee has violated the employer's policies. Under this theory, for example, any female who indicated to her employer that she intended to take time off to have children at some point in the future would be guaranteed employment until after she gave birth to a child, and any employee who mentioned an intent to have surgery in the future would be insulated from any consequences of violating the employers' policies. Such an outcome is contrary to what Congress intended in enacting FMLA.

Both FMLA and OFLA specifically provide that an employee who takes medical leave is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. §2614(a)(3)(B) (2007); O.R.S. 659A.171(3)(b) (2007). Although this language specifically applies to employees returning from medical leave, the purpose and intent of FMLA and OFLA squarely supports the conclusion that it applies equally to employees who have requested leave to begin on some date in the future. In other words, even though an employee has requested future, or is currently on, medical leave under FMLA or OFLA, they must continue to perform their job duties to their employers satisfaction and continue to comply with the employer's policies, or be subject to discipline, including termination. Lawson implicitly acknowledges this interpretation because she argues that she should have received a lesser form of discipline instead of being terminated, not that Walgreens could not have disciplined her at all or would have been retaliating against her if it did. In any event, if an employer has justifiable grounds to terminate an employee, the mere fact that the employee has indicated an intent to take leave under FMLA or OFLA does not prevent the employer from terminating that employee. If it were otherwise, then such an employee would enjoy a right or benefit that his or her co-workers would not.

Other judges in this district have taken the same position and allowed an employer to terminate an employee despite the fact the employee had requested or was on medical leave at the time of the termination. In *Laford v. Kinko's, Inc.*, CV No. 03-181-HU, 2004 U.S. Dist. LEXIS 15960 (D. Or. Aug. 9, 2004), Judge Hubel granted summary judgment to the employer on the employee's interference and retaliation claims under OFLA finding that the employee's failure to abide by the employer's policies justified the termination. He noted the absence of a causal connection between the medical leave and the termination and found that the employer had articulated bona-fide reasons for terminating the employee. *Id.* at *23. Judge Hubel refused to give the employee "preferential treatment over someone who had not taken leave." *Id.* at 25. The next year, Judge Mosman determined that an employee's violation of a last chance agreement by taking leave without following the employer's requirements gave the employer a lawful basis for terminating the employee despite the fact that the employee had applied for intermittent leave under the Act.[4] *Kolar v. Unified Western Grocers, Inc.*, CV No. 04-1593-MO, 2005 U.S. Dist. LEXIS 40538 (D. Or. Dec. 1, 2005). More recently, Judge Stewart held that an employee's allegation that she was transferred due to her need to take care of her family, a statement which she believed to be related to her taking FMLA leave to care for her father, created a genuine issue of fact on the issue of whether her employer's actions interfered with her right to benefit under FMLA. *Lucke v. Multnomah County*, CV No. 06-1149-ST, 2008 WL 4372882 at *42-42 (D. Or. Sept. 22, 2008). On the other hand, the employer's statement that she could not perform the essential functions of her job and that she should resign or be faced with termination made at a meeting held the day the employee

---

[4]It is unclear whether the employee was asserting a retaliation or interference claim in this case.

returned from two weeks of FMLA, leave did not support her FMLA claim. "Nothing other than timing in [any] way relates this meeting to the taking of FMLA leave." *Id.* at *43.

Here, Walgreens offers evidence that it terminated Lawson for her improper handling of the Store's payroll on two occasions. Lawson's actions were investigated by two members of Walgreens's Loss Prevention Department, who determined that Lawson had improperly manipulated the payroll system in November 2006 when she deleted Dang's hours and then re-entered them in a way that deprived him of overtime. Specifically, Lawson was found to have violated Walgreens's: 1) Ethics Policy Statement, which provides that all employees would be disciplined, up to and including termination, for making false, artificial or misleading entries in the company records or failing to pay overtime pay as required by the wage and hour laws; 2) Time Card Policy, which provides that "[e]mployees are to be paid according to the hours on their time record"; 3) Transaction Maintenance Policy, which prohibits an employee from altering an employee's time records without the approval of both the Store Manager and notes that anyone increasing or decreasing the hours paid an employee may be subject to termination; and 4) Discipline Policy, which provides employees will be terminated if they "allow[ed] or requir[ed] an employee to work hours other than those that appear on the employee's time card." (Humphrey Decl. at ¶¶ 4-5). The investigators also found that Lawson violated Walgreens's Pay in Lieu of Vacation Policy, which prohibits the payment of accrued vacation hours unless the employee is actually on vacation without the written approval of a Walgreens vice president, in December 2005, when she paid Dang and another employee for accrued vacation on days they were not scheduled to work. (Humphrey Decl. at ¶ 6). There is no evidence that either Humphrey or Watson-Stover knew of Lawson's intent to take medical leave in the near future and their determination could in no way be related to Lawson's

request for FMLA leave.

Royster made the decision to terminate Lawson based on the results of the investigation. Royster was aware of Lawson's intent to take FMLA leave early in 2007. Therefore, the question is whether, as Lawson argues, there is sufficient evidence that Royster's decision was based, to some degree, on Lawson's request for FMLA benefits.

Royster states, unequivocally, that "Ms. Lawson's communications with me about her eventual need for time off work to have surgery and to recuperate from that surgery had nothing to do with my decision to terminate her employment." (Royster Decl. ¶ 26.) This statement is consistent with the evidence. First, Lawson does not dispute that she violated Walgreens's policy, thus establishing this key fact. Next, Royster's decision to terminate Lawson followed and was based on the results of the investigation by Humphrey and Watson-Stover, his belief that Lawson knowingly committed the violations (a belief supported by the evidence that Lawson had five years of managerial experience in three different stores), his discussion with Humphrey and Watson-Stover regarding the proper discipline in this situation, and his understanding of Walgreens's policy on proper payroll practices. Lawson does not contest these statements, leaving unchallenged by any evidence that Royster's decision to terminate Lawson for her violation of Walgreens's payroll practices was not based, in any way, on Lawson's notice of her intent to take FMLA leave.

Furthermore, Lawson admits that she engaged in the conduct found to violate Walgreens's policies, that her conduct could be viewed as suspicious, that Walgreens had terminated other employees for engaging in improper payroll practices, and that she should have been disciplined in some manner. Her real dispute is with the level of discipline imposed: she argues that termination was too severe in light of the fact that her violations were unintentional mistakes and that the real

reason for her termination was her request for leave under the FMLA. While Lawson has no direct evidence that the decision to terminate her was based, at least in part, on her intent to take extended medical leave in the near future, she argues that her perception of Royster's change in attitude toward her after she requested FMLA leave is evidence that he terminated her because she intended to take such leave. She asserts that Royster's treatment of her during the November walk-throughs, his demand that she change out the Halloween stock and his request to Bromell that he provide Royster with negative comments about Lawson, supports this claim.

Lawson complains that Royster, and then Royster and Hasty, walked too quickly during the walk-throughs and didn't wait for Lawson to catch up. At the outset, the court notes that while Lawson advised Royster in late September or early October of 2006, of her medical condition and various forms of treatment, only one of which was surgery, there is no evidence that she took or requested FMLA leave before she advised Royster on November 1, 2006, after the first walk-through, that she had elected to have surgery and would need to five and one-half months of FMLA leave. Lawson stated that she contacted Walgreens's human resources department in late October to discuss her proposed reconstructive surgery but that she didn't advise Royster of her decision to have the surgery until "on or shortly after November 1." (Lawson Decl. at ¶¶ 9-11.) Therefore, Royster was unaware of Lawson's request for FMLA leave at the time of the first walk-through and his treatment of her at that time can not reasonably be attributed to her request.

In any event, Lawson has failed to present evidence that Royster and Hasty's speed during the November walk-throughs was any greater than in her store or any other store at any other time. It appears that the only reason Lawson was having trouble keeping up was that she was wearing a walking cast and was not able to walk as fast as she normally would. Lawson admits that Hasty

visited numerous stores during his trips to Portland and she concedes it was likely he needed to progress rapidly through the Store to allow him to visit other stores that day. She offers no evidence that on the two occasions she cites, Royster behaved differently than he had on previous walk-throughs at her store or any other store. The court finds that the speed of the November walk-through's is not sufficient evidence, if evidence at all, that Royster held animus toward Lawson because she had requested FMLA leave.

Lawson asserts that Royster's order that the Halloween stock be replaced with Christmas stock during the first walk-through is additional evidence that Royster's attitude toward her had changed. Lawson stated that she interpreted Royster's direction to "get this fixed" to be an order that she personally make the change despite the fact that she was working in extreme pain. Royster's direction merely put Lawson in charge of making sure the change in stock was made. Royster did not tell Lawson to change out the stock herself; rather, that was an assumption that Lawson made. In fact, Royster did not intend for Lawson to personally change out the stock but to merely oversee the project and utilize staff members to complete the work, consistent with her position as Store Manager. (Royster Reply Decl. ¶¶ 8-9.) Again, this is not evidence that Royster felt any differently toward Lawson due to her request for FMLA leave or that his actions were based on that request.

Finally, Lawson argues that Royster asked Bromell to provide him with negative comments about Lawson. Royster apparently made this request of Bromell sometime in October 2006. Royster would not have been aware of Lawson's intent to take FMLA leave for her foot surgery at this time, so the request could not have been related to FMLA benefits. Also, Royster explained that both he, as District Manager, and Lawson, as Store Manager, were responsible for training Bromell and that his questions of Bromell about the support he was getting were intended to assist in training of

Bromell, not as a review of Lawson's performance. (Royster Reply Decl. ¶¶ 2-5.) There is no evidence that Royster considered any information that he received from Bromell in response to his question in making his decision to terminate Lawson. In fact, Royster specifically denies that he considered Bromell's communications in deciding to terminate Lawson, and Lawson presents no evidence that calls Royster's denial into question.

The court finds that Lawson has failed to establish that Royster altered his treatment of, or had any animus against Lawson because she advised him of her decision to have surgery and take FMLA leave. The record before the court is void of any direct or circumstantial evidence that Royster considered Lawson's request for FMLA leave in making his decision to terminate her for her violations of Walgreens's payment policies, at least some of which justified discipline up to and including termination. Accordingly, the court finds that Lawson has failed to created a genuine issue of material fact with regard to Royster's reasons for terminating Lawson and that Walgreens is entitled to summary judgment on Lawson's FMLA and OFLA claims.

In its reply brief, Walgreens offered as comparators six Walgreens's employees who were terminated, or asked to resign, for violations of Walgreens's payroll policies between June 2006 and July 2008. Royster testified at his deposition that he was aware at the time he terminated Lawson that Walgreens had terminated other store managers for payroll manipulation, but not that he was aware of these six specific individuals or the circumstances surrounding their terminations. (Riewald Sur-Response Decl. Ex. 2 at 305.) Because there is no evidence that Royster relied on, or was even aware of, these comparators at the time he made his decision to terminate Lawson, this evidence is not crucial to the court's resolution of the primary issue before the court – whether Royster considered Lawson's request for FMLA when deciding to terminate Lawson for her violations of

Walgreens's payroll practices. However, the comparator evidence offered by Walgreens provides more evidence that Royster's decision to terminate was not in any way related to Lawson's request for medical leave under the FMLA and was, as Walgreens argues, consistent with its past efforts to enforce its payroll policies.

Walgreens offered the following comparator evidence:

> Store Manager A. Smith from Gresham, Oregon, was separated from employment on June 19, 2006, for designating certain food merchandise as "trash" in violation of 1506 policy to avoid cost of the payroll that would normally be required to handle and stock the merchandise properly;
>
> Store Manager W. Hackman from McMinnville, Oregon, was separated from employment on September 15, 2006, for attempting to hide payroll hours by charging sick and overtime hours to an unopened store;
>
> Employee C. Chapman from Portland, Oregon, was separated from employment on October 27, 2006, for dishonesty and submission of two hours of sick pay on her time card without approval when her tardiness to work was not related to an illness;
>
> Store Manager L. Emerson from Lakewood, Washington, was separated from employment on February 20, 2007, for manually punching employees out for lunches not taken to reduce store payroll;
>
> Store Manager M. Trzebiatowski from Seattle, Washington, was separated from employment on February 23, 2007, for manually entering excessive lunch times into the timekeeping system when there were missed punches without verifying the accuracy of his entries with the employees; and
>
> Store Manager M. Bernardi from Spokane, Washington, was separated from employment on July 30, 2008. Bernardi was given the option of resigning in lieu of termination for a payroll-related policy violation. Bernardi had allowed hourly employees to clock out prior to holding store meetings and for meeting with employees while they were off-the-clock.

(Royster Reply Decl. ¶15.) In response, Lawson offered her own comparator – District Manager Wendy Burg, who deleted two hours from employee C. Chapman's time card without the employee's approval.

Lawson argues that Walgreens's comparators are not relevant becauses: 1) Royster's subjective belief that Lawson should be terminated is not the proper standard for causation; 2) Royster did not rely on any of the comparators when he made the decision to terminate Lawson; 3) a similarly situated manager who was not terminated raises a factual issue; and 4) the comparators offered by Walgreens are not similarly situated. First, the question before the court is whether Royster considered Lawson's request for FMLA leave in his decision to terminated her. The fact that Walgreens has terminated other Store Managers for conduct similar to Lawson's supports Walgreens's assertion it was justified in terminating Lawson for her violations of Walgreens's policies and that her request for FMLA leave was not considered in making the decision to terminate Lawson. As to Lawson's second objection, Royster indirectly considered comparator evidence when he confirmed with Humphrey and Watson-Stover that Walgreens had fired other managers who had committed the same or similar violations of policy. In her fourth argument, Lawson generally argues that the comparators must hold similar jobs, display similar conduct, and be similarly situated in all respects to be proper comparators. In light of this argument, Lawson's comparator, who was a District Manager dealing directly with a store employee, as well as the store employee in that scenario, are not similarly situated to Lawson, who was a Store Manager dealing with employees over which she had direct supervision. Accordingly, Lawson's third argument is without merit.

Lawson offers specific objections to each of the remaining five comparators. She objects to the use of Smith on the grounds that he was terminated for intentionally disposing of sellable merchandise, not payroll violations. However, the reason Smith gave for his actions was to save the company money by saving on payroll for employees who would have needed to handle the merchandise. Lawson argues that Hackman's termination is dissimilar in that it was based on her

intentional charging employee time to another store on multiple occasions to hide payroll. The record shows that Royster considered Lawson's violations to be intentional and for the purpose of hiding overtime hours to make the Store appear more profitable, but the court acknowledges that while Lawson was found to have engaged wrongful conduct on more than one occasion, she did not engage in such conduct with the same regularity as Hackman. With regard to Emerson, Lawson attempts to distinguish the conduct by noting that Emerson engaged in a widespread practice of clocking out employees for lunch, thereby shorting the employees' pay. Again, while Lawson's violations were not found to be widespread, they did occur on more than one occasion and resulted in an employee not receiving overtime pay to which he was entitled. The court agrees that Trezebiatowski's failure to pay an employee the correct salary for nine months and his entering longer lunch hours, thereby shorting employee's pay on almost 90 different occasions, seems of a different character. However, the actions of both Lawson and Trezebiatowski resulted in employees not receiving pay they were entitled to and every other comparator Walgreens presented was fired for payroll violations similar to Lawson's. That a single comparator's violations appear to have been different is not evidence sufficient to generate a genuine issue of material fact on this point. Finally, the court rejects Lawson argument that Bernardi's requiring employees to attend meetings when they were off-the-clock is dissimilar to Lawson's conduct. The report reveals that Bernardi had two employee clock out prior to attending a store meeting, resulting in the employee not being paid for their time. This conduct is virtually identical to that of Lawson.

In short, while some of the comparators are not sufficiently similar to Lawson to be relevant, for the most part, the type and extent of the wrongful conduct of the comparators supports Walgreens's decision to terminate Lawson for violation of Walgreens's payroll procedures. Lawson

has failed to establish that her request for future FMLA leave played a part in Royster's decision to terminate her. Walgreens's motion for summary judgment on Lawson's FMLA and OFLA claims is granted.

B. Wrongful Discharge

In her Third Claim for Relief for wrongful discharge, Lawson asserts that Walgreens terminated her in retaliation for her pursuing her statutory rights under FMLA and OFLA. Generally, an employer may fire an at-will employee at any time and for any reason, unless doing so violates a contractual, statutory or constitutional requirement. *Patton v. J.C. Penney Co.*, 301 Or. 117, 120 (1986). Oregon law recognizes two narrow exceptions to this rule. The first is when an employee is discharged for exercising a job-related right of important interest. The second is when the plaintiff is discharged for complying with a public duty. *Draper v. Astoria School Dist. No. 1C*, 995 F. Supp. 1122, 1127 (D. Or. 1998)(citations omitted). Invoking rights to benefits under FMLA and OFLA is an employment-related right that may serve as the basis for a wrongful discharge claim. *Washington v. Fort James Operating Co.*, 110 F. Supp. 2d 1325,1334 (D. Or. 2000); *Yeager v. Providence Health System Oregon*, 195 Or. App. 134, 142-43 (2004). To succeed on a claim for wrongful discharge an employee must show that they engaged in protected activity and that the protected activity was a substantial factor in the decision to terminate the employee. *Holien v. Sears Roebuck and Co.*, 298 Or. 76, 90 n.5 (1984). In other words, an employee must establish a "causal connection" between the employment-related right and the adverse employment action. *Pascoe v. Mentor Graphics Corp.*, 199 F. Supp. 2d 1034, 1053 (2001).

The court has already determined that Lawson's request for benefits under FMLA and OFLA was not the reason, either in whole or in part, for her termination. Royster terminated Lawson

because she violated Walgreens's payroll procedures on three different occasions and, as a result, violated numerous personnel policies, some of which provided for discipline up to and including termination. This finding disposes of Lawsons' wrongful discharge claim as well.

Furthermore, Lawson also relies on the temporal proximity of the events at issue, but temporal proximity is not, by itself, sufficient to carry her wrongful discharge claim past summary judgment. The causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two, but there must also be evidence that the employer was aware of the employee's protected activity. *Thomas v. City of Beaverton*, 379 F.3d 802, 812 & n.4 (9th Cir. 2004). *Accord Knox v. Portland,* 543 F. Supp. 2d 1238, 1248 (citing *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir. 1987)) (causation may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities *and* the proximity in time between the protected action and the allegedly retaliatory activity.") (italics added); *Dameworth v. Linn-Benton Community College,* No. 07-6162-TC, 2007 WL 2816216, at *6 (D. Or. Sept. 27, 2007) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."). Indeed, Lawson acknowledges that temporal proximity generally is not enough, by itself, to establish causation, because she notes that temporal proximity must be "coupled with attending circumstances that suggest something other than legitimate reasons for the temporal tie." (Opp. Memo. at 23.)

Here, it is undisputed that Lawson violated Walgreens's payroll policies in several separate respects and that Walgreens, as Royster knew generally and confirmed with the human resources department, had previously terminated other management-level employees who engaged in the same

or similar conduct. Undermining Lawson's wrongful discharge claim is her acknowledgment that disciplinary action was appropriate for her violations of Walgreens's policies; she does not argue, that no disciplinary action should have been taken or that the lesser form of discipline she advocates here would have been retaliatory. Lawson's dispute is with the level of discipline Walgreens administered, termination, but Lawson has not presented evidence to show that the discipline was motivated by her request for family leave or that she suffered a more severe outcome than others who had committed the same or similar policy violations. As Royster knew when he made the decision and as Walgreens demonstrated on summary judgment, in fact Lawson's termination was consistent with Walgreens's past actions against other employees, including managers, who engaged is such conduct. Accordingly, Walgreens is entitled to summary judgment on Lawson's wrongful discharge claim.

*Conclusion*

Walgreens's motion for summary judgment (#16) is GRANTED in its entirety.

DATED this 20th day of March, 2009.

JOHN V. ACOSTA
United States Magistrate Judge

 *{SIB}*